UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington Corporation, | CASE NO. C10-0653 RSM |
| Plaintiff, | ORDER DENYING DEFENDANTS' AMENDED MOTION TO DISMISS |
| v. | |
| AMISH P. SHAH, an individual, JOSE A. RIVERA, a/k/a JAY STYLES, an individual, DIGISPACE SOLUTIONS LLC, a California Limited Liability Company, YMULTIMEDIA LLC, a California Limited Liability Company, and DOES 1-50, | |
| Defendants. | |

## I. INTRODUCTION

This matter comes before the Court on Motion to Dismiss (Dkt. #19) brought by

Defendants Shah, Rivera, Digispace Solutions LLC and yMultimedia LLC ("Defendants").

Microsoft Corporation ("Plaintiff") alleges in this action that Defendants have registered or used

domain names that contain Microsoft trademarks.  Plaintiff makes claims for cybersquatting, contributory cybersquatting, trademark infringement, contributory trademark infringement, false designation, contributory false designation, dilution, contributory dilution, unfair business practices, common law unfair competition, and unjust enrichment. Dkt. #17.  Defendants have moved to dismiss Plaintiff's claims for contributory cybersquatting and contributory dilution, arguing such causes of action are not recognized, and that Plaintiff has failed to state a claim for contributory cybersquatting.  Defendants have also moved to dismiss Plaintiff's claims against Defendant Rivera, arguing that Defendant must do more than merely control corporate affairs to personally incur tort liability.  Dkt. #19.

## II. BACKGROUND

Defendants are alleged to have registered domain names containing Microsoft trademarks in order to drive traffic to their website.  Consumers seeking a Microsoft website or product are mistakenly drawn to Defendants' website through Defendants' alleged use of Microsoft trademarks.  Consumers who believe they are downloading a Microsoft product are then allegedly tricked into interacting with Defendants, who in turn solicit users to download emoticons.  Defendants allegedly receive payment when a visitor clicks on links or advertisements displayed on their website, or when a visitor downloads or installs a product such as the emoticon toolbar.

Moreover, Defendants are alleged to have induced others to engage in infringement and cybersquatting by providing instruction on how to misleadingly use Microsoft marks to increase website traffic.  Further, Defendants also allegedly sold a product that contained software to allow buyers to easily create websites incorporating Microsoft marks.  This product allegedly included a video narrated by Defendant Shah.

1
**III. DISCUSSION**

2
**A. Contributory Cybersquatting**

3
   1. <u>Case Precedent</u>

4
     The first issue is determining whether Plaintiff may bring a novel cause of action for

5
contributory cybersquatting.  The Anti-Cybersquatting Consumer Protection Act ("ACPA")

6
creates liability for certain forms of cyberpiracy.  Under the ACPA, a plaintiff must show that

7
"(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is

8
identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant

9
acted with 'bad faith intent to profit from that mark.'" *DSPT International v. Nahum*, No. 08-

10
55062 2010 WL 4227883 at *3 (9th Cir. Oct. 27, 2010); 15 U.S.C. § 1125(d)(1)(A).

11
     It is well established that the theory of contributory liability, as found in the context of

12
tort law, is applicable to trademark infringement.  *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d

13
259, 264 (9th Cir. 1996).  Contributory trademark liability applies where a defendant (1)

14
intentionally induces another to infringe on a trademark or (2) continues to supply a product

15
knowing that the recipient is using the product to engage in trademark infringement.  *Id.* (citing

16
*Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 854-855 (1982)).

17
     In the case at hand, Plaintiff makes a claim for contributory cybersquatting, along with a

18
claim for cybersquatting.  The cause of action of contributory (or induced) cybersquatting has

19
neither been explicitly addressed by an appellate court nor by statute.  However, several federal

20
district court cases have at least discussed the notional cause of action.  In *Ford Motor Co. v.*

21
*Greatdomains.com*, plaintiff brought claims for direct and contributory liability for

22
cybersquatting, trademark infringement, and dilution against the owner of a website that

23
auctioned domain names.  177 F.Supp2d 635 (E.D.Mich 2001).  In addressing the contributory

24

1    liability of the domain name auctioneer, the *Ford* court discussed the familiar "flea market"

2    analysis.  This analysis states that a flea market that exercises "direct control and monitoring"

3    over its vendors may be liable for contributory infringement if it "suppl[ied] the necessary

4    marketplace." *Id.* at 646 (quoting *Lockheed Martin Corp.* v. *Network Solutions, Inc*., 194 F.3d

5    980, 984-985 (9th Cir. 1999)).  The court noted that the analysis, while traditionally applied to

6    trademark infringement, could potentially be applied to allegations of cybersquatting.  *Id.* at 647.

7            However, the ACPA requires a showing of "bad faith intent," which is not a requisite

8    element under traditional trademark infringement, unfair competition, and dilution causes of

9    action.  Therefore, the *Ford* court reasoned that a claim for contributory cybersquatting would

10   require a somewhat heightened standard.  *Id.*  *Ford* explained that it was insufficient for

11   defendant Greatdomains.com to have a mere awareness that the infringing domain names were

12   being sold over its website.  Instead, a plaintiff must show that the defendant "cyber-landlord"

13   knew or should have known that its vendors had no legitimate reason for having registered the

14   disputed domain names. Ultimately, the court concluded that a claim for contributory liability

15   could not be maintained against the owner of the domain-name auctioning website.  *Id.*  A

16   defendant such as Greatdomains.com that creates a marketplace for domain names "could not be

17   expected to ascertain the good or bad faith intent of its vendors."  *Id.*  Therefore, contributory

18   liability for cybersquatting could apply to "cyber-landlords" only in exceptional circumstances.

19          The *Ford* court declined to find the defendant liable not because the court did not

20   recognize a cause of action for contributory liability in the context of cybersquatting, but rather

21   because the requisite bad faith could not be shown with respect to a "cyber-landlord" who could

22   not have known that vendors utilizing the marketplace for domain names had no legitimate

23

24

ORDER DENYING DEFENDANTS' AMENDED MOTION TO DISMISS - 4

1   purpose.  However, the decision recognized the applicability of a potential cause of action for

2   contributory cybersquatting under the facts of the case.

3       The conduct of the *Ford* defendant differed significantly from the alleged conduct of

4   Defendants in the case before this Court.  Plaintiff's claim for contributory liability in the context

5   of cybersquatting focuses on Defendants allegedly providing instructions and their alleged sales

6   of a method known as the "Magic Bullet System," which is meant to teach buyers how to use

7   Microsoft marks in order to sell the emoticon-related software.  In essence, the contributory

8   cybersquatting claim alleges that Defendants induced others to use domain names incorporating

9   Microsoft marks.  Defendants did not simply provide a marketplace where a trade in domain

10  names may take place, as was the case in *Ford*.  Rather, Defendants allegedly developed and

11  marketed a method, the sole purpose of which was to allow purchasers to profit from the illicit

12  use of Microsoft marks.  Unlike the defendant in *Ford*, the Defendants in the case at hand either

13  knew or should have known that the purchasers of the "Magic Bullet System" could not have had

14  a legitimate reason for purchasing the method.  Therefore, it is likely that Plaintiff has  made a

15  sufficient showing of Defendants' bad faith under the heightened standard employed by the *Ford*

16  court.

17      In addition, another district court decision recognized the cause of action for contributory

18  cybersquatting in its refusal to dismiss plaintiff's claim for contributory cybersquatting.  *Solid*

19  *Host, NL v. Namecheap, Inc.*, 652 F.Supp.2d 1092, 1117 (C.D. Cal. 2009).  These two decisions,

20  along with the case at hand, reveal the relevance of the cause of action for contributory

21  cybersqatting.  Moreover, the *Ford* decision has provided a simple framework that addresses the

22  ACPA's additional element requiring bad faith.

23

24

ORDER DENYING DEFENDANTS' AMENDED MOTION TO DISMISS - 5

2.   Interpreting the ACPA

The Lanham Act itself does not expressly address causes of action for contributory liability.  Nonetheless, the court-made doctrine of contributory liability for trademark infringement is well-established.  *Fonovisa, Inc.* 76 F.3d 259.  Courts have simply applied the traditional principles of tort law to impose liability on those who have assisted with or contributed to infringement.  *Id.*  Both trademark infringement and cybersquatting are tort-like causes of actions to which the theory of contributory liability would appear to be naturally suited. A recent Ninth Circuit decision interprets the ACPA broadly, and therefore lends support to allowing claims for contributory cybersquatting.  *DSPT International v. Nahum,* No. 08-55062 2010 WL 4227883 at *3 (9th Cir. Oct 27, 2010).  In *DSPT International*, the defendant argued that the ACPA was inapplicable to his actions, which included using plaintiff's mark to gain leverage over the plaintiff in bargaining for money that defendant claimed he was owed.  *Id.*  The Ninth Circuit concluded that while the paradigmatic harm that the ACPA was meant to eradicate is the practice of cybersquatters registering hundreds of domain names, the statute "is written more broadly than what may have been the political catalyst that got it passed," and is therefore intended to prevent such bad-faith use of a mark in a domain name.  *Id.*

In the current case, Defendants' alleged conduct falls squarely within the statute's goal of imposing liability on those who seek to profit in bad faith by means of registering, trafficking, or using domain names that contain identical or confusingly similar marks.  Defendants allegedly sought to profit in bad faith by teaching others how to trade off the widespread recognition of Plaintiff's mark in order to drive traffic to a given website.  A defendant who seeks to profit by selling a method that teaches others how to benefit from violating the ACPA should not be able to escape liability by interpreting the statute so narrowly.  The practice of instructing others on how to engage in cybersquatting runs counter to the purpose of the ACPA.  Finally, "it is a well-

1   established canon of statutory construction that a court should go beyond the literal language of a

2   statute if reliance on that language would defeat the plain purpose of the statute." *Bob Jones*

3   *Univ. v. United States,* 461 U.S. 574, 586 (1983).  As *DSPT International* makes clear, the

4   ACPA should not be read so narrowly as to unduly constrain the protections the statute is meant

5   to afford against cybersquatters.

6

7   **B.  Contributory Trademark Dilution**

8         The second issue is whether Plaintiff may bring a novel cause of action for contributory

9   dilution.  Owners of famous marks are afforded a cause of action under the Trademark Dilution

10   Act.  15 U.S.C. §1125(c).  Dilution can occur by blurring of the famous mark, which weakens

11   the connection between the good and the mark in the minds of consumers.  Dilution can also

12   occur by tarnishment, where a defendant makes use of the mark in an unwholesome manner or

13   connects it to inferior goods.  Like contributory cybersquatting, a cause of action for contributory

14   trademark dilution has never been directly addressed by statute or by appellate courts.

15         However there has been some discussion of the cause of action in preceding cases.  The

16   only appellate treatment of the issue came in *Lockheed Martin v. Network Solutions, Inc.*, where

17   the Ninth Circuit denied leave to amend a complaint to state a claim for contributory dilution.

18   194 F.3d 980, 986 (9th Cir. 1999).  While the *Lockheed* court acknowledged that contributory

19   dilution was not an established cause of action, the court's denial of leave to amend was

20   predicated on the plaintiff's failure to meet the standard necessary to show contributory liability.

21   The Ninth Circuit recognized the cause of action as potentially viable and cited *Kegan v. Apple*

22   *Computer* for its definition of contributory dilution as the encouragement of others to dilute.  No.

23   95 C 1339, 1996 WL 667808. (N.D. Ill. Nov. 15, 1996). Other more recent decisions have

24   declined to dismiss the cause of action, without affirmatively reaching the issue of the cause of

1   action's actual existence.  *See Google, Inc v. American Blind & Wallpaper Factory, Inc.,* No.

2   C03-05340, 2005 WL 832398 (N.D. Cal. Mar. 30, 2005); *Steinway, Inc. v. Ashley*, No. 01 CIV

3   9703, 2002 WL 122929 (S.D.N.Y. Jan. 29, 2002); *Perfect 10, Inc. v. Cybernet Ventures, Inc.,*

4   167 F.Supp 2d 1114 (C.D. Cal. 2001).

5         As with contributory cybersquatting, contributory dilution is a tort-like cause of action

6   which naturally lends itself to the theory of contributory liability.  In the case at hand,

7   Defendants are alleged to have encouraged others to utilize the famous Microsoft mark in such a

8   way that could cause dilution of the Microsoft mark.  The Trademark Dilution Act seeks to

9   provide a mechanism through which owners of famous marks may seek protection against

10  exactly the kind of harm – in the form of blurring or tarnishing – that is alleged in the present

11  case.  It would be inconsistent with the Trademark Dilution Act to prohibit a cause of action for

12  contributory dilution.

13

14  **C.  Claims against Rivera**

15        Defendants rely on *Transgo, Inc. v. Ajac Transmission Parts Corp.* in arguing that the

16  claims against Defendant Rivera must be dismissed.  768 F.2d 1001 (9th Cir. 1985).  Defendants

17  contend that in order to be held personally liable for trademark infringement, corporate officers

18  must specifically direct or personally take part in infringing activities.  However *Transgo* states

19  that an officer can also be held liable for all torts which he authorizes.  768 F.2d at 1021.  The

20  complaint alleges that each individual and corporate defendant has engaged in activity prohibited

21  by the ACPA. Dkt. #17, ¶ 6-9.   The complaint describes the conduct at issue and repeatedly

22  refers to the defendants Shah and Rivera, along with the named companies, as "Named

23  Defendants."  There are sufficient facts alleged for the claims against Defendant Rivera to

24  survive at this early stage.

ORDER DENYING DEFENDANTS' AMENDED MOTION TO DISMISS - 8

1

## IV. CONCLUSION

2          Having reviewed the relevant pleadings and the remainder of the record, the Court finds

3 and ORDERS:

4          (1) Defendants' Amended Motion to Dismiss (Dkt. #19) claims for contributory

5 cybersquatting, contributory dilution, and the claims against Defendant Rivera  is DENIED.

6

7

8          Dated January 12, 2011.

9

10

11

12

RICARDO S. MARTINEZ
13                                        UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24